1 | GERTI MUHO
| 1100 BISCAYNE BLVD 5303
2 | MIAMI, FL 33132
| (212) 300-3826
3 | GM@GMCAPITAL.NET

4 | PLAINTIFF, PRO SE

5

6

7

8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

9

10

GERTI MUHO,                                    Case No. 4:14-cv-03219-HSG

11                Plaintiff,                    **FIRST AMENDED COMPLAINT**

12        vs.

13 | CITIBANK N.A.,                             Date: None Set
                                               Time:
14                Defendant.                    Ctrm: 15, 18th FL, San Francisco
                                               Judge: Hon. Haywood S. Gilliam, Jr.
15

16                              **PARTIES**

17    1.    Plaintiff Gerti Muho ("Plaintiff" or "Muho") is a natural person and resident of this district

18 during the pertinent events Plaintiff alleges herein in Plaintiff's FIRST AMENDED COMPLAINT.

19    2.    Defendant Citibank, N.A. ("Citibank") is a national association and a depository institution

20 headquartered in North Dakota.

21

22                      **JURISDICTION AND VENUE**

23    3.    This court has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1332(a)

24 because plaintiffs and defendants are residents of different states and the amount in controversy exceeds

25 seventy-five thousand dollars ($75,000).

26

27

28

**FACTUAL ALLEGATIONS**

4.     Plaintiff is a registered investment adviser ("RIA") with the Securities and Exchange Commission ("SEC") under the Investment Advisor's Act. Plaintiff is the RIA of mega-fund Leveraged Hawk, Inc. ("Leveraged Hawk"). Leveraged Hawk survives by operation of law a group of hedge funds formerly known or referred to as Richocourt.

5.     Leveraged Hawk has assets best valued at the present time to exceed USD 1 billion. Leveraged Hawk's assets are comprised of cash,[1] current investment holdings, and, for their most part, rights or claims for payment to Leveraged Hawk by parties whose identity and source of liability to the claims by Leveraged Hawk isn't subject to any serious dispute.

6.     Leveraged Hawk owns rights or claims to payments against its own former co-managers Fletcher Asset Management, Inc. ("FAM") and Citco Group, Ltd. ("Citco"), and claims against hedge funds and hedge fund managers who wrongly profited at Leveraged Hawk's expense over the years from payoffs FAM and Citco thinly veiled to them as investments purportedly being made for Leveraged Hawk. The list of known hedge funds and hedge fund managers with reasonably undisputable liability to Leveraged Hawk is a list of who's who in finance.

7.     Leveraged Hawk's claims and rights to payments are also usually secured against persons believed will have little difficulty satisfying payments they owe to Leveraged Hawk in full and with ease in most instances. Citco, for example, has USD one trillion in private assets under custody; well, Citco publicly proclaimed on its website to have had USD one trillion in private assets under custody before Leveraged Hawk by Plaintiff sued it the first time; Citco removed the claim from its website after the filing by Leveraged Hawk by Plaintiff in that suit.

---

[1] Leveraged Hawk has about USD 30 million in liquid cash currently possessed illegally and quickly dissipated by Corinne Ball of Jones Day LLP who now manages the interloping creature of fraud and crime FAM and Citco created in the Bankruptcy Court in the Southern District of New York to frustrate Plaintiff's efforts to holding them accountable for their past wrongdoing.

8.     Leveraged Hawk expects satisfaction, moreover, of almost all claims and rights to payments the hedge funds and the hedge fund managers owing it do not satisfy to be satisfied by the hedge funds and the hedge fund managers servicers, like Citibank, whose willful ignorance over the years enabled the very taking of the assets giving rise to Leveraged Hawk's claims.

9.     Defendant Citibank learned about Plaintiff and about the threat Defendant Citibank faced from Leveraged Hawk during the summer of 2013. Plaintiff was alerted of un-bargained for attention by an apparent obsession with a Plaintiff profile on LinkedIn that was developed around mid-August by a Mr. Jaw Shows. Mr. Shows was a senior vice president of Defendant Citibank at the time his obsession for Plaintiff's online profile developed, and Mr. Shows had also served as FAM's chief compliance officer until Spring of 2013. Mr. Shows colleagues from Citibank, moreover, quickly joined Mr. Shows to becoming obsessive Plaintiff followers afterwards.

10.    Defendant Citibank itself began its campaign to terrorize Plaintiff out of existence a few days after its executives first developed their Internet craze on Plaintiff's LinkedIn. Defendant Citibank wasted no time thereafter in deciding to usurp its role as holder of deposits for Plaintiff and for Plaintiff related entities. And while Plaintiff presented an insurmountable obstacle that a dozen major law firms could not bear, Plaintiff's trusting character and unshaken beliefs in things list justice and honesty made Plaintiff extremely vulnerable to the terrorizing effects openly illegal conduct could have on Plaintiff who himself saw the rules and inviolable.

11.    Plaintiff, himself, is the product of personal experiences and personality traits common in society and commonly in opposite, but in somewhat of a rarity convergent in Plaintiff himself. Plaintiff attended and was graduated from Berkeley law school in 2012. Alphonse Fletcher, Jr. and his FAM lost control of what is today Leveraged Hawk when they relied on the stereotyped abilities, experience, risk-appetite, and awe of the establishment of recent law school graduates to value the same in Plaintiff. And

Alphonse Fletcher, Jr. and his FAM had available all the first hand information and experience they needed to have to have readjusted their stereotypical evaluation of the Plaintiff.

12.   Plaintiff is not, however, a lawyer himself. Plaintiff has failed the California Bar Exam each and every one of the two times Plaintiff has taken the lawyer qualification exam. Plaintiff plays a different game, and Plaintiff plays lawyer only when playing lawyer is Plaintiff only chance to continue to play at all. In his game, however, Plaintiff has yet to find an honest or dishonest lawyer who can beat Plaintiff at honestly his game.

13.   Plaintiff recently re-read the article that summarized the first suit Plaintiff filed in this District as Leveraged Hawk, Inc. v. Global Hawk Ltd. et al. that Plaintiff reintroduces herein in the form of Exhibit A. Plaintiff was slightly shocked at the clarity and coherence of argument the reviewer appears to have mastered out of Plaintiff's first Leveraged Hawk v. Global Hawk complaint.

14.   In July Plaintiff began the end of Citco and FAM. In august hsbc clear 2 month and good to go on all grounds. In late august p won without even showing up in De State ct. All p needed was a trip to Delaware to access rest of $$ and then begin to really play. But Plaintiff couldn't take the trip because Plaintiff's mouth couldn't close from the first visit at the Citibank branch weeks before; and from every visit since Plaintiff made on every day for any information on why the law no longer the law anymore and why Citibank refused to acknowledge any accounts ever again.

15.   Plaintiff forgot Delaware for Citibank's actions had made Plaintiff shaken and unsure of what was or was not sure. Plaintiff was busy chasing away for any law that could first would make the terrorizing of Citibank stop; or at least a law firm that could have explained to Plaitniff a new set of rules that Plaintiff could depend on would be followed. Plaintiff was then robbed by Weingarten; Plaintiff blinded copying the FBI on e-mails with Weingarter. Citibank created world where lawyers only advice was something along the line of go /self.

16.   Yes, a lawyer could have helped. A lawyer could still help. Forget lawyers: English majors with some English sense. But see below.

17.   Plaintiff asked an honest friend from law school whose response Plainitff includes below for help with editing Plaintiff's writings of his affidavits that Plaintiff subsequently filed in his case against Fletcher et al in the Southern District of Florida in early 2014. Again Plaintiff asked for help with Plaintiff's writing, given Plaintiff had never written any legal filings previously and was hoping to get any help available. Plaintiff's friends appears to have read the affidavits and responded with:

> The most obvious oddity in these documents is that you have one filing addressed to a district in New York, and the other is In the northern district of CA. Honestly these papers don't make much sense, and I'm not sure why you chose these particular documents to send to me. Also, in your correspondence with a woman from a bank (possibly Citi?) it also appears odd that the emails are 1)out of order entirely (they should be either chronological or reverse chron--- the way you have it, there is no order. The letter is in the middle, surrounded by the responses, which is not how email replies work......and 2) that the person you are writing with apparently changed their font and color during their day. She sometimes writes in small blue ,then switched to black, then back to blue........ Gerti Gerti Gerti..... Tsk tsk. Please don't spend any additional time trying to convince me that this is what you allege, Because clearly this story is being manipulated by you; to what end, I don't know. Perhaps you worked at this Firm and have embezzled some funds? Perhaps you had a psychotic episode whilst interning there? Perhaps none of it is real at all? I have no idea. What is going on ? All this time you spend on this project is wasted. You should devote yourself to something that will help you in the long run; this is not it. I hope you are not seriously facing criminal prosecution for this situation. That is something your going to need an attorney who handles federal Matters for, preferably with white collar crimes as a specialty. I can probably get a few names of good criminal lawyers in that area. But this civil stuff is a sham, please go see a shrink and get this worked out before u cause some long term problems for yourself. I really hope you listen to me on that front. I have no reason to lie to you, and I have no ulterior motives. I'm just calling it as I see it.

18.   Plaintiff's friend truly did not have an ulterior motive. That the girl even answered Plaintiff's plea for help is a sign that she was interested in helping Plaintiff, as most of Plaintiff's law school friends were too worried of potential client relationships and would never even answer. This truly depressing e-mail portrays just how Citibank turned Plaintiff's world to one where every honest person thought Plaintiff was just crazy, where even Plaintiff's family turned their back on Plaintiff for they were just too

scared of the dangers they would face for helping. The e-mail response is indeed truly a prime example of the nightmare Citibank created for Plaintiff to experience after Plaintiff's winnings of the fight for what is now Leveraged Hawk.

19.   Plaintiff never succeeded in finishing off Citco and FAM with his Global Hawk lawsuit that Plaintiff filed back then. Citibank stopped that, costing Plaintiff hundreds of millions in lost gains and more pain and sufferings than can be measured by output of the Fed's printing presses.

20.   Plaintiff's efforts were thwarted after all by Plaintiff's bank, Defendant Citibank. Citibank, among other things, ended Plaintiff's initiative against Citco and FAM when Citibank denied Plaintiff access to his bank accounts, refusing demands by a Plaintiff it rendered penniless and helpless for access to his own deposits and for his account to be closed.

21.   Plaintiff used Citibank for all his deposits until Citibank, for its illicit reasons decided in August 2013 it would terminate Plaintiff access to his Citibank account in every illegal way. Citibank usurped its position as holder of Plaintiff's money to debilitate Plaintiff's person and Plaintiff's trade. Starting in August 19, 2013, Citibank, in a series of bizarre acts denied Plaintiff access to his own deposits, left Plaintiff moneyless, stole Plaintiff's funds, sent Plaintiff chasing ways to close his account, humiliated Plaintiff's person and his trade, repeatedly, and left Plaintiff stranded and in physical danger. More generally, Citibank breached its agreement with Plaintiff, robbed Plaintiff's possessions, including his opportunities, and ended Plaintiff's pursuit of the dirtiest players in finance: Citco, FAM, and JP Morgan, and ended or seriously bruised Plaintiff stellar career and trade.

22.   Plaintiff held a deposit account with Citibank. Plaintiff had opened the account in 2009 in Berkeley, California. Plaintiff at the time was about to begin his first year of law school at Boalt and needed a safe place to deposit his money. To put it differently, the only consideration Plaintiff sought and that Citibank so, so eagerly gave him then was consideration almost on par with consideration a hole in the ground or a mattress also could have gave to Plaintiff. Citibank offered Plaintiff more branches in

more major cities across the nation, giving Citibank an edge for Plaintiff's business over all other banks that surrounded the campus. Plaintiff could use Citibank's more dispersed branches to withdraw or deposit funds easily, which made Citibank a far superior product to what any hole in the ground or any mattress could have gave Plaintiff. That means that while truly superior to a hole in the ground, Citibank was still providing Plaintiff with a product in the range a hole in the ground or a mattress still provided Plaintiff. Plaintiff would have ran out the door, had the banker told Plaintiff that Citibank also ensured all customers received its version of early adjudication of their sins as part of their banking. To day no Citibank banker appears to be aware of the extralegal adjudication their bank appears to wish to provide customers whenever Citibank would find such service of beneficial to Citibank's own matters. That means that Citibank bankers still aren't telling customers such consideration is part of their banking package. That means Plaintiff was not told, and subsequently was not sold consideration so abhorrent to the actual deal that Plaintiff and Citibank then entered.

23.    So multiple branches in multiple cities are what Citibank offered Plaintiff. That's it. The Citibank banker that opened Plaintiff's deposit account told Plaintiff over a cup of coffee about all the shiny perks Citibank offered, and about all the different types of debit cards that were available to Citibank customers. The debit cards are an extension of the availability that against Citibank sold to Plaintiff. Highlighting that the banker discussed shiny debit cards means that the banker discussed nothing else of any consequence with the Plaintiff. The coffee highlights just how badly Citibank wanted to be depositor of his deposits for Plaintiff. So in the agreement between them Citibank was not in a strong position to force on Plaintiff the abhorrent terms that it now lists and wishes. And even under the strictest four-corners rules—even assuming a contract actually existed—the fraud exception arising from the failure to discuss material terms would ultimately result in Plaintiff's contract with Citibank to be an implied in fact contract, or simply as Plaitniff calls it, an "agreement."

24.     For the following four years, Plaintiff used his Citibank deposit account for all his deposits. And Citibank allowed Plaintiff access to his deposits upon Plaintiff's demand at any time, at any location, and without delay, as agreed. This means that even if a contract existed and that it was once magically binding, the contract became implied in fact by the parties conduct over the subsequent four years of dealings. Plaintiff used Citibank for "all" deposits means that Plaintiff was induced by the conduct of Citibank—i.e., any time, any place, any location, to provide Citibank with new consideration, "all" deposits, that Plaintiff provided to Citibank in exchange for the highlighted service or highlighted 'new' service that became the consideration Plaintiff received from Citibank.

25.     The early adjudication offering of sins moreover, even if—even if! originally enforceable was either waived, modified out, or re-interpreted over the ensuing four years to enable to parties to continue their relationship regardless of the sins Plaintiff certainly committed, some using those very shiny debit cards it received from Citibank, without any mentioning whatsoever of nay pre-adjudication.

26.     And ultimately, that Plaitniff and the banker discussed shiny debit cards and coffee means nothing else was said. Nothing else was exchanged. This means the agreement was tit for tat and only that. And again, if it wasn't, over the following four years, it was modified to just that, with new consideration by both parties—and no written agreements.

27.     Given this Court's jurisdiction is based on diversity, California law is looked at for the substantive rights held by the parties. And California law makes absolutely clear a contract between a depositor and its bank is by California law an implied in fact contract. And under California law a bank must return its depositor's deposits upon demand, immediately. In all, it's Citibank violated by clear and unambiguous acts it repeatedly took all of the following: all, multiple statutes of the California Code, a section of the California Financial Code, long standing California case law on the very bank-depositor matter at stake as codified by the Financial Code itself, and Maxim's of Justice of the State of California

as embedded in the California Code Citibank simply failed to obey in every possible; or that Citibank failed to obey in any way.

28.     And before returning to the very heart of the Complaint, it bears to note that while time is fungible, and dates may be glossed over, especially when in need of explaining away the illegal acts one may have done for 45 days prior to any case existing, and let alone a court order—even an illegal court order issues by an unassigned Judge, 45 days is 45 days without any court order—even an illegal Court one.

29.     Next time Citibank desires to gloss over a nightmare it created for a party without a case filing let alone any orders—even illegal order being issues, because Citibank or Corinne Ball feel its just 45 days, Citibank should consider just how easy someone could gloss over say, a 45 days of a bank run on Citi-bank that Plaintiff hopes Citi-bank never, ever comes to face.

30.     Plaintiff stopped using his Citibank account on or about August 19, 2013. Citibank forced Plaintiff to stop using his Citibank account after Citibank violated its agreement with Plaintiff and stole Plaintiff's funds. Citibank's first violation of Plaintiff's rights occurred on or about August 19, 2013 when Citibank first refused to give Plaintiff access to Plaintiff's own deposits there.

31.     On or about August 19, 2013, Plaintiff requested to withdraw about $500 from his Citibank account. Plaintiff held about $40,000 at Citibank in available funds from past deposits Plaintiff had made there. Notwithstanding Plaintiff's sizeable amount of available funds in his account, however, Citibank denied Plaintiff's request for a $500 withdrawal.

32.     Later the same day, Citibank again shocked Plaintiff when its customer service department refused Plaintiff's plea for assistance. Over a phone call with Citibank's customer service department, Plaintiff was told that Citibank had blocked Plaintiff's access to his funds and that it would continue to block Plaintiff's access until Plaintiff spoke with a Ms. Ivona Sinovic.

33.     Plaintiff was told Ms. Sinovic was Plaintiff's Citibank home branch manager and that Plaintiff should try calling Ms. Sinovic the next day at a New York City phone number Plaintiff was also given.

34.     It is of course untrue that Ms. Sinovic was the branch at Plaintiff's home branch. Plaintiff's Citibank account was a Berkeley, California account and Plaintiff's home branch was the Berkeley, California Citibank branch that had opened Plaintiff's Citibank account. Ms. Sinovic was a New York City based Citibank employee; to the extent of course that Ms. Sinovic was really a Citibank employee.

35.     The Citibank specialist Plaintiff spoke with that day did not provide Plaintiff any other information. Plaintiff's request for an explanation was flatly denied. Plaintiff was told that the only notation on his account was that directing Plaintiff to call Ms. Sinovic and a phone number.

36.     Plaintiff, moreover, was traveling between New York and Florida that day. Plaintiff was driving through the State of Virginia when he spoke with the aforementioned Citibank specialist. Plaintiff's special need to pay for travel necessities like gas, food, and shelter, however, failed to affect Citibank's position of denial of Plaintiff access to all his funds. Plaintiff was out of luck on that Tuesday afternoon and had to just do until he spoke with Ms. Sinovic, according to the Citibank specialist Plaintiff spoke with on that day.

37.     Plaintiff's initial attempts the following morning to speak with Ms. Sinovic failed. Plaintiff's calls to Ms. Sinovic went unanswered at first. It was at this time that Plaintiff noticed something rather strange about Ms. Sinovic's phone. No voice answering machine ever came on to answer her phone. Plaintiff simply heard a ringing tone every time he'd call; over and over again, for more than ten minutes one time, Plaintiff heard nothing but a ringing tone—a never-ending ringing tone, every time he'd call Ms. Sinovic. Clearly Ms. Sinovic was someone whose actions Citibank did not want known.

38.     Some tries later, a woman with a thick, broken, Eastern-European accent answered Plaintiff's call. The woman sounded rather confused at first but then told Plaintiff Ms. Sinovic came in later in the day. Plaintiff was told to call back after 10:30am that day.

39.     Some time after 10:30am, a younger sounding woman alleging she was Ms. Sinovic answered Plaintiff's call. She stated that the "back office" had blocked Plaintiff's account and that she "had no idea what the issue was" but that she would have the "back office" give Plaintiff a call. In a strange rush, Ms. Sinovic hung up the phone. Plaintiff remained stranded in the State of Virginia without access to his deposits even after he had done as Citibank had requested and had given Ms. Sinovic a call.

40.     Plaintiff failed to receive a call from Ms. Sinovic or from Ms. Sinovic's "back office" that day, or on any other day. Plaintiff's many calls to Ms. Sinovic also went unanswered since that day.

41.     Plaintiff visited a local Citibank branch upon arriving at his destination in Miami, Florida in order to close his Citibank account. The Citibank employee reviewed Plaintiff's account, spoke to her direct supervisor about the notation on Plaintiff's account, and returned to tell Plaintiff that they could indeed close Plaintiff's account. The Citibank employee then asked if Plaintiff wanted his deposits back in cash or via a bank check.

42.     Before Plaintiff received any of his deposits back, however, the employee's supervisor, joined by the branch manager, asked Plaintiff to take a seat in the waiting area. After a significant wait, the manager returned to the waiting area where Plaintiff was told to wait.

43.     The manager told Plaintiff his account would not be closed that day. The manager said that she had not been able to speak with the person that the notation on Plaintiff's account directed Plaintiff and others to call for information about the account, or Ms. Sinovic. The manager then told Plaintiff that "very important people, very high up at Citibank" had placed the hold on Plaintiff's account. This, Plaintiff was told, meant the hold on Plaintiff's account was about something very bad and very serious. The manager repeated that she was not going to allow Plaintiff to close his account, at least not until she

1    had spoken with Ms. Sinovic. Plaintiff was then asked to leave and told he could return to try another

2    day.

3        44.    Two weeks later Plaintiff still remained without access to his money. Citibank's capricious,

4    self-serving, and shamelessly illegal actions were, with every passing moment, destroying Plaintiff's

5    trade. On September 3rd, Plaintiff, in dire need of access to his funds, opted to write a direct e-mail to

6    Citibank about the matter.

7

8        45.    In his e-mail, Plaintiff openly addressed Plaintiff's lawsuit against FAM and Citco; Plaintiff

9    openly addressed rumors by FAM and Citco that Plaintiff had stolen funds from Plaintiff's own

10   investment funds; and Plaintiff openly told Citibank that Plaintiff needed to pay a nominal Court fee the

11   following day in connection with his lawsuit against FAM and Citco in the Northern District of

12   California in order to preserve recovery rights against FAM and Citco for Plaintiff's investment funds.

13

14       46.    In his e-mail, which Plaintiff addressed a Citibank employee named Veronica, Plaintiff

15   wrote:

16       "Veronica:
          Please confirm that you are in receipt of the signed letter your fax machine
17        accepted this morning, as it did yesterday too. Also I must be direct hhighly valued
          rights ere for Citibank appears to be too used to its power to appreciate its
18        deadliness: If an entity cannot pay say a court ordered fee of, say $300.00 to allow
          the entity to sue and recover, say $207,000,000.00, causing the failed entity to
19        loose its rights to recover the aforementioned $207,000,000.00 from certain
          professional trust abusers, wouldn't you say that the entity blocking the payment of
20        the $300.00 fee is as responsible for the foregone $207,000,000.00 as the
          professional trust abusers who actually took the money in the first place. Not
21        morally for it's oversight may not be with ill will, intentional, or to its benefit. It
          may receive no benefit at all. Unfortunately, morals are too hard to discern.
22

23        It's a job I believe a judge and jury have a monopoly on. I remember even the US
24        government asked a judge to approve any freeze of any money from that fugitive
          who stole billions from software companies by pirating software out of a
25        basement. The same US government that has the authority to fly a missile using a
          robo-who-done-it into someone's jean pocket did not freeze a penny from a
26        convicted fugitive, if I recall the facts right. A judge did, guided by laws written
          for all, and never through an oral opinion or phone call. It's a job a bank steals
27        from them at significant peril I would say. I wouldn't want the duty, unless the
          compensation was sufficient to justify the responsibility, of course.
28

I recall from a contract's course that in California inmates started a practice of filing financing statements against prison guards. The guards of course could remove it immediately by merely stating X was not authorized to make the filing-reserved for creditors only. I think they created an exception to prevent unauthorized parties from causing the 5 point credit drop that resulted from the inmates misfiling.

Anyway I am no lawyer, and am guided by mere sense of right and wrong. It works for me and keeps me out of trouble, for it appears to coincide often enough with law to be as good a substitute as you can get without paying a fortune in legal fees.

I have no reason to believe any accounts that I am an authorized party for are not fully operational. I am slightly preoccupied with slightly more timely matters, and have wasted too much time with a service provider. I know Leveraged Hawk must make a number of payments to preserve some rights: Please do let me know if any any of the four accounts I can quickly think of has restrictions on them whatsoever, stating of course the details of any such restrictions.

Best, Gerti"

47.    Plaintiff's need to preserve his investment funds rights against FAM and Citco did not sway Citibank. The next day, Plaintiff visited his Citibank home branch in Berkeley, California. Plaintiff's attempt to withdraw funds—any funds—from his deposits and Plaintiff's attempts to close his account were all, unfortunately, refused. The stupefied Citibank bankers, who clearly were just too afraid to risk losing their jobs, refused Plaintiff and threw him out of the branch.

48.    Citibank also never responded to Plaintiff's request for written confirmation of any accounts tied to Plaintiff at Citibank facing any restrictions whatsoever. Such of course was expected given the cowards took actions that were shamelessly illegal in order to thwart Plaintiff's trade and end Plaintiff's heroics—and all to save the banking executives that a few years prior had caused Citibank's demise and fall.

49.    Citibank then brazenly reversed payments that had been made out of Plaintiff's account. The morning of September 10th Plaintiff learned that Citibank had reversed recent payments Plaintiff had been made, calling them "fake checks."

50. Citibank's statement that Plaintiff had used "fake checks" was nothing but an outrageous lie of course. In fact the payments Citibank reversed had not even been made by check. All were payments that were made using the Automated Clearing House ("ACH"); they were recurring payments to the U.S. Department of Education, BMW Finance, American Express, and to Paypal—all pre-authorized and pre-verified by both Citibank and the initiating parties.

51. By mid September it became evident that Plaintiff and his trade were quickly crumbling because of Citibank's acts. Plaintiff had made over a dozen visits to over a dozen different Citibank branches for the purpose of accessing or closing his account. All had failed. Every time, Plaintiff was thrown out like a common criminal. Penniless, Plaintiff was left without any remedy whatsoever to force Citibank to return to him his deposits or to close his account. Plaintiff to date has neither accessed nor closed his Citibank account.

52. On September 29 of that month, FAM and Citco sued Plaintiff alleging Plaintiff had stolen $2 million or so from his own investment funds. Their bogus suit was ignored completely by the judge the case was assigned to, Magistrate Judge Nathaniel Fox.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT

53. Plaintiff incorporates by reference the preceding allegations of this complaint and the allegations set forth in the remainder of this complaint.

54. Citibank agreed to hold Plaintiff's money, keep it safe for him, and make it available to him around the clock, as he needed.

55. Citibank agreed to let Plaintiff close his account at any time for any reason whatsoever.

56. Citibank agreed to keep Plaintiff informed and at all times it agreed to act in good faith.

57. And lastly Citibank agreed not to act illegally.

58. Citibank breached its agreement with Plaintiff when it withheld from Plaintiff his own money, failed to keep his money safe for him, refused to give his money back to Plaintiff, refused to let

Plaintiff close his account, refusing to inform Plaintiff about his account, and when it failed to act in good faith; leaving Plaintiff stranded, humiliated, and ruining his trade.

59.    Citibank violated its agreement with Plaintiff when it set aside the law and violated it for the purpose of stealing from Plaintiff his funds and his trade.

60.    Citibank's breach of its agreement with Plaintiff was the direct and proximate cause of the damage Plaintiff suffered personally and professionally, emotionally and physically.

WHEREFORE, Plaintiff demands judgment against Citibank as follows:

61.    For compensatory direct and consequential damages that were caused by Citibank in the amount of USD 52,040,000.00, with interest, until paid in full.

62.    For costs and fees incurred in bringing this action.

63.    For such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION - CONVERSION

64.    Plaintiff absolutely owned the money he deposited in his Citibank account.

65.    Citibank interfered with Plaintiff's ownership of his funds when it withheld them without reason, cause, or right.

66.    Citibank's interference stole the very essence of Plaintiff's ownership of his funds.

67.    Citibank's wrongful taking of Plaintiff's funds was capricious, unconscionable, malicious, illegal and at all timed intended to deprive Plaintiff of the use and enjoyment of his ownership rights.

68.    Citibank's intentional interference was a direct and proximate cause of the damage Plaintiff suffered personally, professionally, emotionally, and physically.

WHEREFORE, plaintiff demands judgment against Citibank as follows:

69.    For compensatory direct and consequential damages that were caused by Citibank in the amount of USD 52,040,000.00, with interest, until paid in full.

70. For exemplary and punitive damages in an amount USD 250,000,000.00 or as determined at trial sufficient to punish and set an example of Citibank.

71. For costs and fees incurred in bringing this action; and

72. For such other and further relief as this Court deems just and proper

## THIRD CAUSE OF ACTION – TRESPASS TO CHATTELS

73. Plaintiff gave Citibank his personal working capital to hold and make available to him on his demand without delay. Plaintiff's working capital was of course key to the successful completion of the recovery efforts against FAM and Citco that Plaintiff had maintained and advanced at great personal cost until then.

74. Citibank had no right, want, interest, or even knowledge of Plaintiff's monies before Plaintiff deposited them there. Citibank then only came to hold Plaintiff's money solely because Plaintiff needed access it readily on his demand and without delay. Citibank's rights to Plaintiff's deposits ended in their entirety, in full, the instant Plaintiff requested Citibank avail his deposits for him readily and without delay.

75. Citibank's refusal to return to Plaintiff his funds that Citibank repeated day since it first refused Plaintiff's very first request on that August 19th or so was an unnatural transgression of the very essence of Plaintiff's property right in every way.

76. Citibank's illegal trespass against of Plaintiff's property rights in in perfectly inconsistent with Plaintiff's possession of any property rights in any way. Citibank's purposed acts to trespass and refuse Plaintiff of all use of his property, day after day, was the direct and proximate cause of the damage Plaintiff suffered personally, professionally, emotionally, and physically.

WHEREFORE, Plaintiff demands judgment against Citibank as follows:

77. For compensatory and consequential damages of USD 52,040,000.00 that Citibank caused Plaintiff by its acts, with interest, until paid in full.

78..   For exemplary and punitive damages in an amount of USD 250,000,000.00 or as determined at trial to fairly punish and set an example of Citibank and its acts.

79.   For costs and fees incurred in bringing this action; and

80.   For such other and further relief as this Court deems just and proper.

FOURTH CAUSE OF ACTION – INTERFERENCE WITH ECONOMIC RELATIONS

81.   Plaintiff incorporates by reference the preceding allegations of this complaint and the allegations set forth in the remainder of the complaint.

82.   Plaintiff informed Citibank in writing that he required access to the money Plaintiff had deposited with Citibank in order to pay court fees in connection with Plaintiff's suit against FAM and Citco, which would likely result in an economic benefit to Plaintiff and Plaintiff's Investors due to the overwhelming evidence Plaintiff had amassed against FAM and Citco. Citibank thus knew of the economic relationship between Plaintiff and his Investors and FAM and Citco.

83.   Citibank still refused Plaintiff all access to his accounts or to close his accounts. Citibank's actions were wrongful for the reasons alleged in the preceding allegations of this complaint and the allegations set forth in the remainder of the complaint.

84.   As a result of Citibank's action, Plaintiff lost his expected benefit to himself and his Investors.

85.   Citibank knew of the relationship between Plaintiff and the Department of Education, BMW Finance, American Express, and Paypal because it had routinely processed ACH payments to them prior to halting ACH payments to them under the guise of "fake checks".

86.   As a result of Citibank's actions, the Department of Education, BMW Finance, American Express, and Paypal closed their accounts with Plaintiff, thus disrupting the economic relationship Plaintiff had with those parties.

87.    Citibank's conduct as alleged in the preceding allegations of this complaint and the allegations set forth in the remainder of the complaint was a direct and proximate cause of the damage Plaintiff suffered personally, professionally, emotionally, and physically.

WHEREFORE, plaintiff demands judgment against Citibank as follows:

88.    For compensatory direct and consequential damages that were caused by Citibank in the amount of USD 50,000,000.00, with interest, until paid in full.

89.    For exemplary and punitive damages in an amount USD 250,000,000.00 or as determined at trial sufficient to punish and set an example of Citibank.

90.    For costs and fees incurred in bringing this action; and

91.    For such other and further relief as this Court deems just and proper.

**FIFTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

92.    Plaintiff incorporates by reference the preceding allegations of this complaint and the allegations set forth in the remainder of the complaint.

93.    Citibank's conduct in refusing to give Plaintiff the money he had on deposit, or to explain its actions was outrageous conduct. Citibank forced Plaintiff on an impossible, exhausting, and fruitless journey through Citibank's own smoke and mirrors only to still be unable to access his deposits or receive any explanation for Citibank's conduct. Citibank, as a national association is in a privileged and powerful position over the lives of its customers. As such it functions primarily on public trust. This public trust is bolstered by numerous regulations imposed on it by State and Federal Regulators. When Citibank acted to withhold all money from Plaintiff before any suit had been filed, it used its position of power to judge Plaintiff guilty and harmed Plaintiff's interest of due process, access to justice and the ability to pay court fees and attorneys.

94.    Citibank knew that Plaintiff would be harmed, and would be vulnerable to and would suffer emotional distress because any reasonable person would in the circumstances. Citibank further knew that

sending Plaintiff on a hopeless and impossible series of hoops to close his account would cause Plaintiff emotional distress because any reasonable person would so suffer when his trusted bank suddenly decided to steal from him with no explanation.

95. Citibank's conduct in preventing Plaintiff from accessing his accounts was a direct and proximate cause of the damage Plaintiff suffered personally, professionally, emotionally, and physically. WHEREFORE, plaintiff demands judgment against Citibank as follows:

96. For damages in the amount of USD 2,000,000.00, with interest, until paid in full;

97. For exemplary and punitive damages in an amount USD 10,000,000.00 or as determined at trial sufficient to punish and set an example of Citibank.

98. For costs and fees incurred in bringing this action; and

99. For such other and further relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION – NEGLIGENCE

100. Citibank owed a legal duty to the Plaintiff to exercise ordinary care.

101. Citibank breached the duty in one or more of the following ways:   a. Defendant failed to comply with it's the parties agreement; and  b. Defendant failed to comply with well-established clear and unambiguous laws of the State of California that governed the relationship between Plaintiff and the Bank.

102. Citibank breach proximately caused Plaintiff's injury.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims and causes of action so triable.


Dated this 24th of March, 2015.


Gerti Muho, Pro Se
(212) 480-0001 x 117

19

Exhibit A

Money managers plundered $200 million from hedge funds, suit says

(August 2, 2013) - Two asset management companies violated federal securities laws by bilking about 20 hedge funds of $200 million in a complex scheme involving a web of feeder funds, according to a lawsuit filed in a California federal court.

*Leveraged Hawk Inc. et. al. v. Global Hawk Ltd. et al.*, No. 13-cv-3469, *complaint filed* (N.D. Cal. July 25, 2013).

Plaintiff Leveraged Hawk Inc., the alleged "survivor" of the hedge-fund group, says defendants Fletcher Asset Management Inc. and Citco Trading Inc. operated the scheme for more than 15 years using an array of "special purpose vehicles" to place investments in the funds using cash borrowed from financial institutions.

FAM and Citco then "plundered" the funds' assets to pay off the debt of a co-defendant, Cayman Islands-based Global Hawk Ltd.

The suit also names as defendants FAM's owner Alphonse Fletcher, of San Francisco, and a roster of offshore and domestic firms, including Delaware-based Wilmington Trust NA, which allegedly acted as the funds' custodian.

The complaint, filed in the U.S. District Court for the Northern District of California, also accuses FAM and Monaco-based Citco of overvaluing the assets in order to charge excessive fees for their respective roles as manager and administrator of so-called "master funds" that were part of the alleged scheme.

### Investments exhausted 'almost entirely'

According to the complaint, FAM and Citco made their own cash and in-kind investments in the debt-ridden hedge funds, then "pillaged" them by redeeming the investments at their high value.

The funds were left with shares or promissory notes in the feeder funds, which "had been exhausted almost entirely," the suit says.

FAM and Citco then "forced" the hedge funds to sink $200 million into sham investments and used part of the money to repay notes Global Hawk had issued to the Royal Bank of Scotland, the suit says.

RBS is not named in the suit.

The complaint alleges FAM, Citco, Global Hawk and the other defendants violated the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.

Fletcher and several of the entities also face control-person liability under Section 20(a) of the Act, 15 U.S.C.A. § 78t(a).

The complaint also alleges unjust enrichment and seeks other relief under California state law.

The suit seeks compensatory damages of at least $200 million and rescissory damages regarding the defendants' management fees and advisory contracts.

By Michael Nordskog

Exhibit A                                                                                    Muho v. Citibank